Ronny J. MOREAU, Appellant,

v.

Jesse BROWN, Secretary of Veterans Affairs, Appellee.

No. 94–883.

United States Court of Veterans Appeals.

Sept. 12, 1996.

Vincent A. Wenners, Jr., Manchester, NH, was on the brief, for appellant.

Mary Lou Keener, General Counsel; Norman G. Cooper, Assistant General Counsel; David W. Engel, Deputy Assistant General Counsel; and Susan A. Wuchinich, Washington, DC, were on the brief, for appellee.

Before FARLEY, HOLDAWAY, and STEINBERG, Judges.

STEINBERG, Judge:

The appellant, Vietnam veteran Ronny J. Moreau, appeals a June 29, 1994, decision by the Board of Veterans' Appeals (BVA or Board) denying entitlement to service connection for post-traumatic stress disorder (PTSD). Record (R.) at 8. For the reasons that follow, the Court will affirm the decision of the Board.

## I. Background

The veteran served on active duty in the U.S. Army from November 1965 to November 1967, with service in Vietnam from April 1966 to April 1967. R. at 28, 131. His Army records show assignments as an ammunition storage specialist and a vehicle mechanic while he was in Vietnam. R. at 94. His August 1964 preinduction and October 1967 separation medical examination reports stated that he was psychiatrically normal. R. at 33, 64. His service medical records do not note any complaints of or treatment for a psychiatric condition. R. at 35–57.

In January 1990, the veteran filed with a Department of Veterans Affairs (VA) regional office (RO) an application for VA service-connected disability compensation or non-service-connected pension for PTSD. R. at 86. The VARO requested that the veteran list in-service traumatic experiences in detail, provide a work history, and submit medical evidence. R. at 88–89. The record does not indicate that the veteran replied to the RO letter, and an April 1990 RO decision denied service connection for PTSD. R. at 97.

A "readjustment counseling therapist" at a VA Vet Center, Mr. Brock, submitted to the RO in July 1990 a letter stating that the veteran had been seen at the Center several times since May 1990, had reported the occurrence of stressful events while in Vietnam, and "suffer[ed] from a very severe case of [PTSD]." R. at 101–02. The RO again asked the veteran to list the traumatic experiences in detail, provide a work history, and submit medical evidence. R. at 106–07. In June 1990, the veteran, complaining of depression and suicidal feelings, was seen by a VA physician and hospitalized. R. at 110, 112. He participated in a "trauma recovery group" in July 1990. R. at 112.

In August 1990, the veteran submitted to the RO a statement that in Vietnam he had carried out "body recovery" activities; that in March or April 1967 his unit had endured a two-hour mortar attack; that he had experienced nightmares, flashbacks, and depression; and that he had held about 35 jobs since separation from service. R. at 121. The National Archives furnished the RO with a 1967 "Unit History" of the veteran's ordnance company, which stated that his unit had supported "combat operations conducted by the Fourth Infantry Division, First Caval-

ry Division[,] and 173d Airborne Brigade" and had suffered some mortar and "Sapper" attacks, apparently in December 1967. R. at 144. The history referred to difficult working conditions during the monsoon season and the need for security precautions due to the possibility of enemy infiltration. R. at 145. From August 27 to September 28, 1990, he was hospitalized at a VA medical center (MC), where he reported a history of counseling "on and off" since the early 1970s "due to depression and poor anger control". R. at 149. His discharge diagnoses were PTSD and depression. R. at 149.

An October 1990 RO decision continued the denial of PTSD on the grounds that no in-service "life-threatening experience" had been shown and that there was no evidence that the veteran had been in combat. R. at 154, 156. The veteran filed a November 1990 Notice of Disagreement (NOD). R. at 161. A December 1990 Statement of the Case (SOC) noted that the stressors mentioned in the veteran's counseling reports "cannot be verified". R. at 167. In his February 1991 VA Form 1–9, Substantive Appeal to the BVA, the veteran stated:

> I spent one year in Vietnam from 1966 to 1967. During that year I was volunteer[e]d to pick up dead bodies that [were] without arms or legs or faces blown apart, and I also washed down bodies with *DDT* powder and water to kill the red and black ants which made tunnels under the skin.

R. at 173. He also submitted a January 1991 letter from Mr. Brock listing specific traumatic events and concluding that the veteran had "a severe case" of PTSD (R. at 178), and an April 1991 VAMC physician's statement that he was "[t]otally unemployable at present" due to PTSD (R. at 176; *see* R. at 183).

At a May 1991 RO hearing, the veteran testified under oath that for about four months in Vietnam he had been informally assigned to help as needed with picking up dead bodies in the field, washing them down, and bagging them for refrigeration and embalming. R. at 183–89. He testified that at times he would have to go by helicopter to an area where servicemen had been killed and "we would just hurry up because we didn't want to get hit because these guys just got

killed". R. at 186. He also asserted that on one occasion a helicopter crashed behind him and he turned around and saw that the "whole crew was killed". R. at 193. The hearing officer determined that because of the absence of proof of an in-service stressor there was no evidence that the veteran had PTSD as a result of military service. R. at 199.

In June 1991, the veteran filed a net-worth statement indicating that he had no income or assets and had been totally disabled since May 1990. R. at 203–05. A September 1991 VA examination report diagnosed "nervous condition reactive depression". R. at 217. In November 1991, a VA psychiatrist diagnosed chronic, delayed PTSD and recurrent depression; he stated, "I have no doubt as to his honesty in his reports", and noted:

> I have no doubt that Mr. Moreau suffers and suffered from [PTSD] for a long time. The death of his child has impacted upon his life quite significantly. Mr. Moreau blamed himself for the death[,] and he has difficulty dealing with that particular death.
>
> Following [a] recent visit to [the Vietnam memorial] moving wall in Concord, his symptoms of [PTSD] have gotten worse and his depression as a result also has been quite intense. [The veteran] is unable to distract himself from the thoughts of Vietnam for any length of time. He is ruminating over feelings of helplessness, hopelessness and suicidal thoughts.

R. at 237.

A January 1992 BVA decision remanded the claim to the RO to take the following actions: (1) Ask the veteran to provide more specific information as to stressors, particularly "approximate dates and names of those he witnessed being killed or wounded"; (2) seek confirmation of the stressors and obtain the veteran's unit history; (3) if any of the stressors were confirmed, schedule a psychiatric examination of the veteran, to include review of the claims file, "by a psychiatrist who is knowledgeable in the diagnosis and treatment of [PTSD], and who has not previously examined the veteran" and obtain a report from that psychiatrist containing "detailed social, industrial and mili-

tary histories"; and (4) obtain treatment records postdating the May 1991 RO hearing and associate them with the file. R. at 243–45. Also in January 1992, the RO determined, after considering records concerning the veteran's mental and physical condition, that he did not incur PTSD in service and that he was 30% disabled by non-service-connected depression. R. at 250.

On remand, the RO obtained VAMC records stating that the veteran was hospitalized from July 9 to August 20, 1991, with diagnoses of chronic PTSD and bipolar disorder and was unemployable at discharge. R. at 257, 260. The patient history stated that the veteran reported being shelled when delivering ammunition to a unit in the field. R. at 258. Under "HOSPITAL COURSE", the report stated: "It was felt that part of the veteran's difficulty was unresolved grief from the loss of his grandfather and his six-week-old daughter from many years ago. This grieving would have been impaired by the difficulties he encountered in Vietnam." R. at 259. The physician noted the following about the veteran's symptoms during admission: "[Those symptoms] included some broken sleep with occasional nightmares. He did not complain during admission of much difficulty with intrusive thoughts". R. at 260.

In a January 1992 statement, the veteran asserted that he could not provide names of people who were killed because he was assigned to pick up dead bodies in the field and they were not identified, and that the approximate dates of this assignment were about two weeks in May or June 1966 and on approximately four more occasions between June 1966 and January or February 1967. R. at 265–66. In February 1992, the Army informed the RO that "the information received is insufficient for the purpose of conducting meaningful research on the veteran's behalf." R. at 274.

The RO obtained on remand a June 1983 report of a private psychiatric hospitalization noting that the veteran was " 'coy' and obviously manipulative" and "would probably fall into the character disorder bailiwick", R. at 328, and a report of a March 1990 private psychiatric hospitalization with resultant diagnoses of major depression and possible

PTSD. R. at 305–06. An April 1992 letter from Mr. Brock reiterated that the veteran suffered from chronic PTSD, but did not express any view on whether that condition was related to the veteran's service in Vietnam. R. at 331.

A September 1992 U.S. Army and Joint Services Environmental Support Group (ESG) letter to the RO stated:

We have enclosed extracts from the Operational Reports—Lessons Learned (OR–LL) submitted by the United States Support Command, Qui Nhon (USA Sup Comd, Qn), the higher headquarters of the 188th Ordnance Company (188th Ord Co), for the periods August 1–October 31, 1966; and February 1–April 30, 1967. The extract states that graves registration duties were performed by elements of the USA Sup Cmd, Qn, during these periods. However, we were unable to document that the 188th Ord Co participated in graves registration duties.

We are unable to verify that [the veteran] performed graves registration duties. [His] DA Form 20 states that his military Occupational Specialties during his Vietnam tour were [an] Ammunition Supply Specialist and a Wheel Vehicle Mechanic. Documentation describing any additional duties and responsibilities [the veteran] performed during his Vietnam tour should be listed within his Official Military Personnel File.

R. at 358. A May 1967 OR–LL extract stated: "A total of 516 remains were processed by [graves registration] personnel with the Support Command. Graves Registration personnel performed no search and recovery missions as units recovered their own dead during operations." R. at 361. The ESG noted that the veteran could contact the National Archives and Records Administration for military records. R. at 367.

A December 1992 RO decision denied service connection for PTSD on the grounds that there was no verification that the veteran had ever been assigned to graves registration duties; that the OR–LL extracts indicated that no search and recovery missions were performed by Graves Registration unit personnel during April 1966 to April 1967; and

that although the veteran did have psychiatric problems they could have arisen from postservice traumas such as the death of his child and his work collecting bodies for a mortuary and towing vehicles involved in accidents. R. at 373–75. In July and August 1993, he was treated at a VAMC PTSD unit and diagnosed as having PTSD. R. at 419–20. In a September 1993 letter, Dr. Poire, a psychologist, opined that the veteran had PTSD due to traumas suffered in service and that his daughter's death had "triggered a flood of intrusive thoughts and nightmares" relating to his Vietnam experiences. R. at 416–17.

At a September 1993 RO hearing, a friend of the veteran who had known the veteran before service testified under oath that when the veteran had returned home after service he had displayed abnormal changes in his personality and that his symptoms had gotten worse over the years. R. at 425–26. A policeman testified under oath that he had known the veteran for four and one-half years and that the police had been called to the veteran's residence several times because of his mood swings from rage to depression. R. at 427, 438. The veteran gave sworn testimony that records did not show his assignment to a Graves Registration unit because he had worked with them only when they did not have sufficient personnel, for a total of three or four months. R. at 429–30. He also testified that his postservice jobs of operating a wrecker and transporting bodies to funeral homes was not traumatic because the bodies were covered up. R. at 435–36. The hearing officer "affirmed" the RO's decision denying service connection for PTSD, stating that there was no evidence of an in-service stressor and that the evidence available indicated that the veteran's military unit did not participate in graves registration duties. R. at 448–49. In October 1993, the RO confirmed its previous decision and continued the veteran's 30% rating for a non-service-connected psychiatric disorder. R. at 453.

In the June 29, 1994, BVA decision here on appeal, the Board found that the claim was well grounded but denied entitlement to service connection for PTSD. R. at 8–9. The

Board determined that the veteran had not been in combat and that he had "not been shown to have been exposed to an event during service that was outside the range of usual human experience and would be markedly distressing to almost everyone." R. at 8.

## II. Analysis

### A. Well–Grounded Claim

Section 5107(a) of title 38, U.S.Code, provides in pertinent part: "[A] person who submits a claim for benefits under a law administered by the Secretary shall have the burden of submitting evidence sufficient to justify a belief by a fair and impartial individual that the claim is well grounded." The Court has defined a well-grounded claim as follows: "[A] plausible claim, one which is meritorious on its own or capable of substantiation. Such a claim need not be conclusive but only possible to satisfy the initial burden of [section 5107(a) ]." *Murphy v. Derwinski,* 1 Vet.App. 78, 81 (1990). A well-grounded service-connection claim requires a medical diagnosis of a current disability; medical or, in certain circumstances, lay evidence of in-service incurrence or aggravation of a disease or injury; and medical evidence of causal nexus between the in-service injury or disease and the current disability. *See Caluza v. Brown,* 7 Vet.App. 498, 506 (1995), *aff'd per curiam,* 78 F.3d 604 (Fed.Cir.1996) (table); *see also Heuer v. Brown,* 7 Vet.App. 379, 384 (1995) (citing *Grottveit v. Brown,* 5 Vet.App. 91, 93 (1993)); *Rabideau v. Derwinski,* 2 Vet.App. 141, 143 (1992) (without proof of a present disability, there can be no valid claim). Required medical evidence must be "to the effect that the claim is 'plausible' or 'possible' ". *Grottveit, supra.* A Board determination whether a claim is well grounded is a conclusion of law subject to de novo review by the Court under 38 U.S.C. § 7261(a)(1). *See Grivois v. Brown,* 6 Vet. App. 136, 139 (1994); *Grottveit, supra.*

In this case, the Court holds that the veteran's claim for service connection for PTSD is well grounded because he has presented numerous current diagnoses of PTSD and medical opinions stating that his PTSD was incurred in service.

## B. General PTSD Requirements

The VA regulation dealing with the adjudication of PTSD claims provides:

> (f) *Post-traumatic stress disorder.* Service connection for post-traumatic stress disorder requires medical evidence establishing a clear diagnosis of the condition, credible supporting evidence that the claimed in[-]service stressor actually occurred, and a link, established by medical evidence, between current symptomatology and the claimed in[-]service stressor. If the claimed stressor is related to combat, service department evidence that the veteran engaged in combat or that the veteran was awarded the Purple Heart, Combat Infantryman Badge, or similar combat citation will be accepted, in the absence of evidence to the contrary, as conclusive evidence of the claimed in[-]service stressor.

38 C.F.R. § 3.304(f) (1995); *see also* VA ADJUDICATION PROCEDURE MANUAL M21–1 [hereinafter MANUAL M21–1], Part VI, ¶ 7.46 (Oct. 11, 1995) (first sentence).

In *West (Carleton) v. Brown,* the Court held, under 38 U.S.C. § 1154(b), 38 C.F.R. § 3.304, and the applicable MANUAL M21–1 provisions, as follows:

> Where . . . VA determines that the veteran did not engage in combat with the enemy, or that the veteran did engage in combat with the enemy but the claimed stressor is not related to such combat, the veteran's lay testimony, by itself, will not be enough to establish the occurrence of the alleged stressor. Instead, the record must contain service records which corroborate the veteran's testimony as to the occurrence of the claimed stressor.

*West,* 7 Vet.App. 70, 76 (1994); *see also Zarycki v. Brown,* 6 Vet.App. 91, 98 (1993). The standard set forth in *West* and *Zarycki,* that in a noncombat situation "the record must contain service records which corroborate the veteran's testimony as to the occurrence of the claimed stressor" (*West, supra*), differs somewhat from the standard that the Court had set forth in *Doran v. Brown,* 6 Vet.App. 283, 289 (1994). *Doran* held that the MANUAL M21–1 statement that "[s]ervice records must support the assertion that the veteran was subjected to a stressor of suffi-

cient gravity to evoke the symptoms in almost anyone" means that "those service records which are available must support, i.e., must not contradict, the veteran's lay testimony concerning his non-combat-related stressors". *Doran,* 6 Vet.App. at 289. The Court also stated in *Doran* that "the absence of corroboration in the service records, when there is nothing in the available records that is inconsistent with other evidence, does not relieve the BVA of its obligations to assess the credibility and probative value of the other evidence." *Id.* at 290–91.

The MANUAL M21–1 provision cited in *West, Zarycki,* and *Doran* was recently revised, and now provides as to "Evidence of Stressors in Service":

> (1) **Conclusive Evidence.** Any evidence available from the service department indicating that the veteran served in the area in which the stressful event is alleged to have occurred and any evidence supporting the description of the event are to be made part of the record. Corroborating evidence of a stressor is not restricted to service records, **but may be obtained from other sources** (see *Doran v. Brown,* 6 Vet.App. 283 (1994)). If the claimed stressor is related to combat, in the absence of information to the contrary, receipt of any of the following individual decorations will be considered evidence of participation in a stressful episode: [there follows a list of combat medals].
>
> . . . .
>
> Other supportive evidence includes, but is not limited to, plane crash, ship sinking, explosion, rape or assault, [or] duty on a burn ward or in [a] graves registration unit.

MANUAL M21–1, Part VI, ¶ 7.46.c (Oct. 11, 1995) (emphasis added). This Court previously has held that certain MANUAL M21–1 provisions in paragraph 7.46 dealing with PTSD (including the predecessor of subparagraph c.(1), quoted above, which was contained in subparagraph e. of the September 22, 1992, revision of paragraph 7.46) are substantive rules which are "the equivalent of [VA] [r]egulations". *See Hayes v. Brown,* 5

Vet.App. 60, 67 (1993) (citing *Karnas v. Derwinski*, 1 Vet.App. 308, 313 (1991)).

Because *West* and *Zarycki* were based on the MANUAL M21–1 as it existed at the time of those decisions, those opinions are no longer operative insofar as they interpreted the state of prior law and regulation to require that corroborating evidence as to the occurrence of in-service stressors must be found in service records. The MANUAL M21–1 provision at issue here "became effective after the appellant filed his appeal with this Court, [but] the Court and the VA are required to apply these substantive changes to the appellant's claim to the extent that they are more liberal than the earlier provisions" unless Congress has provided otherwise. *West, supra* (citing *Swann v. Brown*, 5 Vet.App. 229, 232 (1993)); *see also Hayes, supra* (quoting *Karnas, supra*); *Wilson (John) v. Derwinski*, 2 Vet.App. 614, 618 (1992).

### C. Combat Status

The veteran does not claim before this Court that he was in combat. Brief (Br.) at 5. The Board found that the veteran had not been in combat. Reviewing this conclusion under the "clearly erroneous" standard, *see Gilbert v. Derwinski*, 1 Vet.App. 49, 53 (1990), the Court concludes that the BVA's decision as to noncombatant status had a plausible basis in the record and thus is not subject to reversal as being clearly erroneous. Evidence in the service records indicated that during his tour of duty in Vietnam the veteran had served in a support unit which was not in combat. R. at 144, 358.

### D. Evidence of Noncombat Stressor

For service connection to be awarded for PTSD, three elements must be present according to VA regulations: (1) a current medical diagnosis of PTSD; (2) medical evidence of a causal nexus between current symptomatology and the claimed in-service stressor; and (3) credible supporting evidence that the claimed in-service stressor actually occurred. *See* 38 C.F.R. § 3.304(f); *see also* MANUAL M21–1, Part VI, ¶ 7.46 (reiterating three PTSD service-connection requirements set forth in regulation § 3.304(f)

and specifically requiring "credible supporting evidence that the claimed in-service stressor actually occurred"). *But cf. Dizoglio v. Brown*, 9 Vet.App. 163, 166 (1996) (dictum questioning whether under MANUAL M21–1 revision adopted in March 1995 credible evidence was still required as to third element).

The MANUAL M21–1, as revised effective October 1995, provides that the required "credible supporting evidence" of a noncombat stressor "may be obtained from" service records or "other sources". This revision differs from the version it replaced in that the old version expressly stated that where a veteran had not been in combat, "a history of a stressor as related by the veteran is, in itself, insufficient". MANUAL M21–1, Part VI, ¶ 7.46f. (Dec. 21, 1992); *see also West, supra* (where veteran was not in combat, corroboration of veteran's testimony as to in-service stressors is required). The new version does not expressly state that a veteran's testimony may not, by itself, constitute credible evidence of the actual occurrence of a stressor. However, since the issuance of the October 1995 MANUAL M21–1 revision, the Court has held that the requirement in § 3.304(f) for "credible supporting evidence" means that "the appellant's testimony, by itself, cannot, as a matter of law, establish the occurrence of a noncombat stressor." *Dizoglio, supra* (citing *Doran, supra* ("if the claimed stressor is not combat-related, [the] appellant's lay testimony regarding in-service stressors is insufficient to establish the occurrence of the stressor")).

In this case, the veteran presented as evidence of an in-service stressor only his own testimony and the medical opinions that related his PTSD to service, including the November 1991 opinion of the VA examining psychiatrist who stated expressly: "I have no doubt as to his honesty in his reports". This evidence clearly would have been insufficient to show an in-service stressor under the old MANUAL M21–1 provisions, because none of it is contained in service records. This case presents the question whether this evidence is sufficient under the provisions of the current statutory and regulatory scheme. The Court's recent holding in *Dizoglio, supra,*

makes clear that the noncombat veteran's testimony alone is insufficient proof of a stressor, but there remains the question whether the medical statements that expressly found the veteran's recitation of facts to be credible and related his PTSD to events experienced in service could qualify as the requisite corroborating evidence of a stressor.

Although the revised MANUAL M21–1 states that proof of an in-service stressor may be obtained from sources other than service records, it does not set forth the type of proof that is required to show a noncombat stressor. The regulations governing service connection for PTSD differ from those governing service connection for other conditions because they require evidence of an in-service stressor rather than evidence of "incurrence or aggravation" of a disease or injury in service or within a postservice presumption period. This Court's caselaw allows a physician's opinion of causal nexus, in certain circumstances, to establish in-service or presumption-period incurrence or aggravation even when the examination on which the opinion was based was made many years after service. *See, e.g., ZN v. Brown,* 6 Vet.App. 183, 194 (1994) (physicians' statements, several years postservice, that "extent of the veteran's current condition is indicative of exposure" to disease in service could provide basis for service connection). Thus, in non-PTSD cases, a physician's opinion can sometimes provide evidence both of service incurrence or aggravation and of a causal nexus between a current condition and service. As to PTSD, § 3.304(f) makes clear that a medical opinion can fulfill the requirement for a nexus between a current diagnosis of PTSD and an in-service stressor, but neither the regulation nor the MANUAL M21–1 makes clear whether a medical opinion based on an examination of the veteran after separation from service can be credible evidence to help establish the "actual" occurrence of an in-service stressor. However, the requirements in § 3.304(f) for a "link, established by medical evidence, between current symptomatology and the claimed inservice stressor" *and* for "credible supporting evidence that the claimed in[-]service stressor actually occurred" indi-

cate that something more than medical nexus evidence is required to fulfill the requirement for "credible supporting evidence".

Were the Court to interpret § 3.304(f) as allowing after-the-fact medical nexus evidence to meet both requirements, the requirement for "credible supporting evidence" could be rendered nugatory. "[I]t [is] fundamental that a section of a statute should not be read in isolation from the context of the whole act, and that in fulfilling our responsibility in interpreting legislation, 'we must not be guided by a single sentence or member of a sentence, but [should] look to the provisions of the whole law, and to its object and policy.'" *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 592, 7 L.Ed.2d 492 (1962) (quoting *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 285, 76 S.Ct. 349, 359, 100 L.Ed. 309 (1956)). "The canons of construction of course apply equally to any legal text and not merely to statutes." *Smith (William) v. Brown,* 35 F.3d 1516, 1523 (Fed. Cir.1994). Therefore, the Court holds that credible supporting evidence of the actual occurrence of an in-service stressor cannot consist solely of after-the-fact medical nexus evidence. Accordingly, the Board did not err in its conclusion that the record does not contain credible evidence of an in-service stressor, and the Court will affirm the decision of the Board.

### E. Pension Claim

The Secretary argues that the appellant has abandoned his claim for non-service-connected pension. Br. at 14–15. The record is not altogether clear on this point. The veteran filed an NOD as to the pension claim in January 1992, at which time he also asked VA to process the adjudication of his service-connection claim before his pension claim, because he did want any delay in his service-connection claim. R. at 268. The record does not show that an SOC or Supplemental SOC (SSOC) was issued as to this claim. A January 1993 SSOC on the PTSD claim stated that the pension claim was "a matter of a separate appeal". R. at 380. On the understanding that the claim remains in appellate status, the BVA must ensure its expeditious

adjudication. *Cf. Tablazon v. Brown,* 8 Vet. App. 359, 361 (1995).

### III. Conclusion

In view of the foregoing analysis, the Court holds that the appellant has not demonstrated that the BVA committed error—in its findings of fact, conclusions of law, procedural processes, or statement of reasons or bases—that would warrant remand or reversal under 38 U.S.C. § 1110, 5107(a), or 7104(a), (d)(1); 38 C.F.R. § 3.304(f). Accordingly, the Court affirms the June 29, 1994, Board decision.

AFFIRMED.