# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 01-1360

RAMON OTERO-CASTRO, APPELLANT,

v.

ANTHONY J. PRINCIPI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued August 20, 2002                      Decided  October 4, 2002  )

*Ronald L. Smith*, of Washington, D.C., for the appellant.

*William L. Puchnick*, with whom *Tim S. McClain*, General Counsel; *Joan E. Moriarty*, Acting Assistant General Counsel; and *Michael A. Leonard*, Deputy Assistant General Counsel, all of Washington, D.C., were on the brief, for the appellee.

Before KRAMER, *Chief Judge*, and STEINBERG and GREENE, *Judges*.

STEINBERG, *Judge*: The appellant, through counsel, seeks review of a May 25, 2001, Board of Veterans' Appeals (Board or BVA) decision that denied a Department of Veterans Affairs (VA) increased rating (greater than 30 %) for his service-connected hypertensive and arteriosclerotic heart disease with unstable angina. Record (R.) at 1-7. The appellant filed a brief asking that the Court reverse the Board decision and award a 60% rating for his disability. The Secretary filed a brief seeking affirmance of the BVA decision, and the appellant filed a reply brief. This appeal is timely, and the Court has jurisdiction pursuant to 38 U.S.C. §§ 7252(a) and 7266(a). For the reasons that follow, the Court will reverse the Board's determination that the criteria for a 60% rating for the veteran's service-connected disability have not been met.

## I. Relevant Background

The veteran served on active duty in the U.S. Army from July 1955 to June 1957. R. at 10. In June 1970, he filed with a VA regional office (RO) a claim for service connection for

cardiomegaly (*see* R. at 77), and in November 1970 the VARO granted that claim and assigned a noncompensable rating (R. at 77). (Cardiomegaly is defined as "hypertrophy of the heart". DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 268 (28th ed. 1994) [hereinafter DORLAND'S]. Hypertrophy is "the enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells". *Id*. at 802.) In May 1973, the RO granted a 30% rating, effective that month, for that disability and also denied service connection for hypertensive vascular disease (R. at 92) (there is no indication in the record on appeal (ROA) as to when the latter claim was filed (*see* R. at 1-717)). In January 1978, the Board, inter alia, denied both a rating increase for the veteran's cardiomegaly and service connection for hypertensive vascular disease. R. at 165-71. The BVA again denied the same rating-increase claim in May 1987. R. at 252-55.

In April and June 1995, the veteran requested reevaluation of the rating for his heart condition and asserted that that condition had worsened. R. at 301, 319. In October 1995, Dr. Jose Cianchini conducted a VA compensation and pension examination and diagnosed the veteran as having "[h]ypertensive cardiovascular disease with history of cardiomegaly". R. at 322. In June 1996, the RO continued the 30% rating for the veteran's cardiomegaly. R. at 326-27. He then filed a timely Notice of Disagreement (NOD) as to that RO decision. R. at 329. At a hearing before a VA hearing officer (R. at 333-52) in October 1996, the hearing officer noted that the RO had not yet issued a Statement of the Case (SOC) in response to the veteran's NOD because new evidence had been requested but had not yet been received by the RO. R. at 334.

Later in October 1996, the veteran filed a claim for service connection for "HB/P [h]ypertensive as secondary condition due to S.C.". R. at 391. In December 1996, he underwent a VA heart examination, and the examiner, Dr. Cianchini, made reference to the October 1995 examination report and reiterated his prior diagnosis of "[h]ypertensive cardiovascular disease with cardiomegaly". R. at 404-05. In May 1997, the RO issued a decision denying, inter alia, what was, in effect, the veteran's claim to reopen the previously disallowed claim for hypertensive vascular disease. R. at 579.

In September 1997, the RO issued an SOC as to the denial of the veteran's increased-rating claim for cardiomegaly. R. at 590-93. The following month, the RO sent a letter to him advising as follows: "The correction on your claim has been done. Service connection for hypertension condition

2

is granted[;] the correct diagnosis of [your] service[-]connected condition is hypertensive cardiovascular disease with cardiomegaly." R. at 595. Enclosed with that letter was a copy of an RO decision of the same date that stated: "The evaluation of service[-]connected cardiovascular condition is continued as 30 percent disabling". R. at 596. The RO then specified that "[h]ypertensive cardiovascular disease with cardiomegaly represent[s] one single disability and all service[-]connected manifestations are rated as one disability." R. at 597.

In March 1998, the veteran requested a new evaluation of his disability. R. at 609. Dr. Cianchini performed an examination on January 7, 1999, ordered a "MUGA test [(multigated cardiac blood pool study)] . . . to evaluate [the veteran's] cardiac status at present", and, after reviewing electrocardiogram (EKG) results, diagnosed the veteran as having "[h]ypertensive cardiovascular disease with left-ventricular hypertrophy". R. at 623. The MUGA test results indicated that "[t]he contractile motion of the left ventricle is adequate with . . . an ejection fraction of 50%". R. at 624. The technician interpreting those results (as countersigned by the verifying physician) noted that the veteran had "adequate left[-]ventricular function" and that "[his] right[-]ventricle contractility is mild[ly] to moderately impaired". *Ibid.* In a June 1999 decision, the RO denied a rating increase for the veteran's disability. R. at 639-40. He filed an NOD in July 1999 as to that decision (R. at 648) and was provided an additional VA examination in June 2000 (R. at 684-86). The examining VA physician, Dr. Edith Toro, noted that a procedure performed in April 2000 had revealed "a small fix perfusion defect on [the] distal anteroapical wall of the left ventricle" and stated that an EKG, performed the day of the examination, had revealed sinus bradycardia and left-ventricular hypertrophy. R. at 686. Dr. Toro also reported that the January 1999 MUGA test had showed "[l]eft ventricular contractivity is mild to moderate [sic] impaired with ejection fraction of 50%". *Ibid.* (It is unclear whether, in so stating, Dr. Toro was reevaluating the 1999 MUGA test results and disagreeing with the prior finding of right-ventricular-contractility impairment or whether she inadvertently mischaracterized those results.) She listed the diagnosis as "[h]ypertensive and arteriosclerotic heart disease" with "[u]nstable angina". *Ibid.* The RO issued an SOC in July 2000 confirming its denial of an increased rating for the veteran's heart condition. R. at 692-97. The veteran then timely appealed to the Board. R. at 701.

In the BVA decision here on appeal, the Board concluded that the veteran did not exhibit

symptoms consistent with a 60% rating under either Diagnostic Code (DC) 7005 or 7007, which refer, respectively, to arteriosclerotic heart disease and hypertensive heart disease, *see* 38 C.F.R. § 4.104, DC 7005, 7007 (2001), (R. at 2) and thus denied a rating greater than 30% for the veteran's hypertensive and arteriosclerotic heart disease with unstable angina (R. at 7). In so deciding, the Board found that the veteran did not, inter alia, "have a left[-]ventricular dysfunction with an ejection fraction of 30 to 50 percent." R. at 2. The Board specifically addressed Dr. Cianchini's and Dr. Toro's respective findings of "left[-]ventricular hypertrophy" and the ejection fraction of 50% that had been noted in the January 1999 MUGA-test-results report. R. at 5. The Board also noted the "small fix perfusion defect" of the veteran's left ventricle that Dr. Toro had reported (R. at 686). R. at 5. After reviewing the evidence of record, the Board concluded:

> [W]hile *the veteran has mild left[-]ventricular impairment with an ejection fraction of 50 percent*, this is considered adequate left[-]ventricular function and there is no evidence of jugular venous distention. Additionally, the veteran experiences relief from his chest pain with rest and medication. Therefore, the Board finds that the veteran's current symptomatology most closely fits within the criteria for the presently assigned 30 percent evaluation.

R. at 6 (emphasis added).

## II. Contentions on Appeal and Oral Argument

In his brief, the appellant argues that the Board decision should be reversed because the Board committed legal error by "reading additional rating criteria" into the applicable DCs. Brief (Br.) at 4. He asserts that DCs 7005 and 7007, quoted in part III.A., below, which contain identical requirements for a 60% rating, require that only one of three listed criteria be met. Br. at 4. He notes that with regard to whether the veteran had "left[-]ventricular dysfunction with an ejection fraction of 30 to 50 percent", as required by DC 7005 and 7007, the Board specifically determined that he had "mild left[-]ventricular impairment with an ejection fraction of 50 percent" but then deemed his left-ventricular function "adequate" (R. at 6) and denied a rating increase. Br. at 8. The appellant contends that the Board deviated from the regulation's objective criteria (Br. at 4) and that the "rating schedule does not grant the Board discretion to make its own determination as to what level of heart dysfunction warrants a 60 percent rating" (Br. at 8).

4

The appellant argues that the Board also erred by "impos[ing] extra[]schedular rating criteria" when evaluating his disability. Br. at 5. In support of this assertion, he contends that the Board considered factors not listed in the rating criteria in the applicable DCs, namely the absence of jugular venous distention and the fact that the appellant experienced relief with rest and medication. Br. at 5. The appellant maintains that the Court "should . . . decide de novo whether the Board's implicit interpretation of the rating criteria for a 60 percent rating" under DCs 7005 and 7007 was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Br. at 7.

The Secretary disagrees; he asks the Court to review the Board's denial of an increased rating under the "clearly erroneous" standard and asserts that the Court should affirm the Board decision because there is a plausible basis in the record for the Board's determination that a rating increase was not warranted and that that determination is thus not clearly erroneous. Br. at 5, 11. He contends that the Board considered adequately all material evidence, including evidence that the appellant considers to be related to factors outside the rating criteria. Br. at 12. The Secretary further asserts that the appellant "simply overlooks the fact that *no medical professional* has equated his left[-]ventricular hypertrophy with inadequate left[-]ventricular function, a necessary component in the 60 percent disability evaluation". Br. at 12. Finally, the Secretary argues that the Board decision contains a complete discussion of the notice and duty-to-assist provisions enacted by the Veterans Claims Assistance Act of 2000, Pub. L. No. 106-475, 114 Stat. 2096 (Nov. 9, 2000) (VCAA) (as codified at 38 U.S.C. §§ 5103, 5103A). Br. at 13. In his reply, the appellant essentially reiterates the reversal arguments in his principal brief. Reply at 2-5.

At oral argument before the Court, the parties disagreed as to whether the phrase "left[-]ventricular dysfunction with an ejection fraction of 30 to 50 percent", as used in both DCs 7005 and 7007 as a requirement for a 60% rating, establishes a subjective criterion, i.e., "left[-]ventricular dysfunction", as well as an objective criterion, i.e., "an ejection fraction of 30 to 50 percent". In addition to the arguments briefed, the appellant contends that the term "with" as used in the regulation has the meaning "as evidenced by" and that there does not need to be a separate finding of dysfunction to qualify for a 60% rating, and the Secretary asserts that "with" means "and" and that, therefore, in order to be eligible for a 60% rating a claimant must have dysfunction in addition to an ejection fraction of 30% through 50%. The Secretary further asserts that the regulation

does not contain the phrase "as evidenced by" and that, under the appellant's theory, the regulation could have been drafted without the term "dysfunction", a term that must be given some meaning by virtue of its presence in the regulation. The Secretary concedes that the appellant's documented ejection fraction of 50% meets the objective criterion; he contends, however, that the Board's finding of "left[-]ventricular impairment" (R. at 6) was not a finding of dysfunction and that the increased rating was properly denied because the evidence does not demonstrate a left-ventricular dysfunction. On the day of oral argument, the appellant submitted to the Court notification of the existence of two additional authorities – namely, the medical definition (from DORLAND'S) of "ejection fraction", set forth below, and the publication of the proposed regulation (with commentary) that became current DCs 7005 and 7007 – that he argues support his position.

### III.  Analysis

#### A.  Applicable Diagnostic Codes

DCs 7005 and 7007 each require the following symptomatology for a 30% rating for arteriosclerotic heart disease and hypertensive heart disease, respectively: "Workload of greater than 5 METs [(metabolic equivalents)] but not greater than 7 METs results in dyspnea, fatigue, angina, dizziness, or syncope, or; [sic] evidence of cardiac hypertrophy or dilatation on electrocardiogram, echocardiogram, or X-ray". 38 C.F.R. § 4.104, DC 7005, 7007. The criteria for a 60% rating in each DC are as follows: "More than one episode of acute congestive heart failure in the past year, or; [sic] workload of greater than 3 METs but not greater than 5 METs results in dyspnea, fatigue, angina, dizziness, or syncope, or; [sic] *left[-]ventricular dysfunction with an ejection fraction of 30 to 50 percent*". *Ibid*. (emphasis added).

#### B.  Ambiguity in DCs 7005 and 7007

We note at the outset of our analysis that the Secretary concedes that the "30 to 50 percent" criterion in DCs 7005 and 7007 means 30% *through* 50%. Therefore, the veteran's ejection fraction of 50% meets that objective criterion in both DCs; the Court accepts the Secretary's reading of that language. Also, there is no dispute between the parties that the veteran's left ventricle is impaired despite the reference to the right ventricle in the initial interpretation of the 1999 MUGA test results (R. at 624). *Cf.* R. at 686 (Dr. Toro's report of those results).

6

The basic principles that apply to construing statutes apply equally to construing regulations. *See Smith (William A.) v. Brown*, 35 F.3d 1516, 1523 (Fed. Cir. 1994). "'The starting point in interpreting a statute is its language.'" *Lee (Raymond) v. West*, 13 Vet.App. 388, 394 (2000) (quoting *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409 (1993)). "In determining the plain meaning of statutory language, 'legislative purpose is expressed by the ordinary meaning of the words used.'" *Jones (McArthur) v. Brown*, 41 F.3d 634, 638 (Fed. Cir. 1994) (quoting *Ardestani v. INS*, 502 U.S. 129, 136 (1991)). "Each part or section of a statute should be construed in connection with every other part or section so as to produce a harmonious whole." *Talley v. Derwinski*, 2 Vet.App. 282, 286 (1992) (internal quotation and citation omitted); *see also Cottle v. Principi*, 14 Vet.App. 329, 334 (2001); *Meeks v. West*, 12 Vet.App. 352, 354 (1999). This Court has previously held:

> [I]t [is] fundamental that a section of a statute should not be read in isolation from the context of the whole act, and that in fulfilling our responsibility in interpreting legislation, "we must not be guided by a single sentence or member of a sentence, but [should] look to the provisions of the whole law, and to its object and policy."

*Moreau v. Brown*, 9 Vet.App. 389, 396 (1996) (quoting *Richards v. United States*, 369 U.S. 1, 11 (1962) (quoting *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 285 (1956))), *aff'd*, 124 F.3d 228 (Fed. Cir. 1997). Where a statute is ambiguous, "interpretive doubt is to be resolved in the veteran's favor." *Brown v. Gardner*, 513 U.S. 115, 117 (1994); *see also Allen (Alfred) v. Brown*, 7 Vet.App. 439, 448 (1995) (en banc) (applying *Gardner* "interpretive doubt" principle to rule in appellant's favor on question of statutory interpretation).

Applying the foregoing principles, the Court concludes that the language in DCs 7005 and 7007 is ambiguous as to whether, in order to qualify for a 60% rating by virtue of having "left[-]ventricular dysfunction with an ejection fraction of 30 to 50 percent", a claimant must demonstrate, as the Secretary contends, that he or she has left-ventricular dysfunction ***in addition to*** having an ejection fraction of 30% through 50%. First, the meaning of the word "with" in the two DCs is unclear. "With" is defined as, inter alia, "as the result of", "accompanied by, attended by, circumstanced by", "having as . . . [an] attribute", "showing or exhibiting", "added to", and "including". WEBSTER'S NEW WORLD DICTIONARY 1534 (3d College ed. 1988). These varied definitions appear to support both parties' interpretations of the term and of its function in the

7

applicable DCs. The DORLAND'S definition of "ejection fraction", however, supports the appellant's construction of the word "with" as the DCs use it: That definition specifies that a normal ejection fraction is 65% (plus or minus 8%) and that "*lower values indicate ventricular dysfunction*". DORLAND'S at 660 (emphasis added).

The commentary published with the proposed regulation in the Federal Register does not make clear whether, for a 60% rating, the applicable clause of the DCs contains only an objective criterion (a finding of diminished ejection fraction within the specified range) or two criteria (a subjective criterion – a finding of dysfunction – as well as the objective one ). That commentary provides in pertinent part:

> Administering a treadmill exercise test [in order to determine whether a claimant's condition satisfies the METs-based criterion] may not be feasible in some instances, however, because of a medical contraindication . . . . We have, therefore, provided *objective alternative evaluation criteria*, such as cardiac hypertrophy or dilatation, *decreased left[-]ventricular ejection fraction*, and congestive heart failure for use in those cases. . . . The *other objective criteria* that we have added as alternatives to the METs-based criteria . . . are . . . a left[-]ventricular ejection fraction of 30 to 50 percent, or more than one episode of acute congestive heart failure in the past year for a 60-percent evaluation.

62 Fed. Reg. 65,207, 65,211 (Dec. 11, 1997) (emphasis added). The appellant argues that the above commentary supports his argument that a claimant, in order to qualify for a 60% rating, need demonstrate left-ventricular dysfunction just by showing an ejection fraction of 30% through 50%, because the commentary specifies that one alternative to the METs-based criterion is "decreased left[-]ventricular ejection fraction", not dysfunction *and* decreased left-ventricular ejection fraction. However, the METs-based criterion itself may be comprised of objective and subjective elements – the objective element in terms of measurement of level of activity and the subjective element in terms of the presence of symptoms of dyspnea, fatigue, angina, dizziness, or syncope. *See* 38 C.F.R. § 4.104, DCs 7005, 7007 (providing for 60% rating where "workload of greater than 3 METs but not greater than 5 METs results in dyspnea, fatigue, angina, dizziness, or syncope"). Moreover, as the Secretary asserts, in promulgating the regulation, VA specifically elected to use the term "dysfunction"; therefore, perhaps the commentary merely addresses "other objective criteria", as an

addition to dysfunction, that were added in that revision of the regulation.

On the other hand, the overall purpose of the rating schedule appears to be at odds with the Secretary's view that the applicable DC clause for a 60% rating requires a showing of dysfunction in addition to an abnormal ejection fraction. Section 1155 of title 38, U.S. Code, provides in pertinent part: "The Secretary shall adopt and apply a schedule of ratings of reductions in earning capacity from specific injuries or combination of injuries. The ratings shall be based, as far as practicable, upon the average impairments of earning capacity resulting from such injuries in civil occupations." 38 U.S.C. § 1155. The definition of "functional impairment" in 38 C.F.R. § 4.10 specifies that "[t]he basis of disability evaluations is the ability of . . . [an] organ of the body to function under the ordinary conditions of daily life including employment." 38 C.F.R. § 4.10 (2001). That regulation further provides that such "evaluations are based upon lack of usefulness[] of these parts or systems, especially in self-support." *Ibid*. Thus, if an individual has been deemed economically impaired and awarded a compensable rating, it follows that he or she is functionally impaired in some way and already exhibits organ or system "dysfunction". Given the rating schedule's purpose, to compensate individuals for economic impairment, once a claimant has met the impairment requirements for a compensable rating, for example, 30% as had the veteran here, it would not appear logical to include "dysfunction" as an additional requirement for a higher rating.

In light of the ambiguity in the language of the regulation and because interpretive doubt is to be resolved in favor of the claimant, *see Gardner* and *Allen*, both *supra*, the Court holds that DCs 7005 and 7007 do not require, in order for a claimant to receive a 60% rating based on "left[-]ventricular dysfunction with an ejection fraction of 30 to 50 percent", a separate showing of left-ventricular dysfunction in addition to an ejection fraction of 30% through 50%. The Court notes that if the Secretary wishes to establish a DC containing two criteria for a 60% rating, it is his obligation to do so clearly, not ambiguously. When interpretive doubt is resolved in favor of the instant appellant, the objective criterion is the sole criterion, and, as noted previously, it is undisputed that he meets that criterion because his ejection fraction was 50%.

Moreover, we hold alternatively that even if the applicable clause of the DCs did, as the Secretary asserts, contain two criteria for a 60% rating, the appellant still would be entitled to a 60% rating, because the Board here specifically found that the evidence of record demonstrated that "the

veteran has ***mild left***[-]***ventricular impairment with an ejection fraction of 50 percent***".  R. at 6 (emphasis added).  Dysfunction is defined as "abnormal, ***impaired***, or incomplete functioning, as of a body organ or part".  WEBSTER'S NEW WORLD DICTIONARY 424 (3d College ed. 1988) (emphasis added).  Thus, once the Board determined that the veteran had "mild left[-]ventricular ***impairment*** with an ejection fraction of 50 percent" (R. at 6) (emphasis added), it could not then find that the veteran did not meet the criteria (if there was more than the objective criterion) for a higher rating. *See Thomas (Edgar) v. Principi*, 16 Vet.App. 197, 200 (2002) (citing *Bailey v. Derwinski*, 1 Vet.App. 441, 446 (1991), for proposition that BVA decision cannot stand where "inconsistent VA fact finding was reached in 'arbitrary and capricious' manner in violation of 38 U.S.C. § 7261(a)(3)(A)"). Accordingly, even if there was merit in the Secretary's argument that the applicable clause of the DCs contains two criteria, the argument would fail on the facts of this case because the Board found that both criteria were met.  In light of that fact, the Board's consideration of factors outside the rating criteria (its findings of no jugular venous distention and relief with rest and medication) could not be a basis for denial of a 60% rating.  *See Drosky v. Brown*, 10 Vet.App. 251, 255 (1997) (holding Board's conclusions legally erroneous where they were based on criteria outside applicable DC); *Massey v. Brown*, 7 Vet.App. 204, 208 (1994) (citing *Pernorio v. Derwinski*, 2 Vet.App. 625, 628 (1992), and concluding that "Board's consideration of factors which are wholly outside the rating criteria provided by the regulations is error as a matter of law").

The Court notes that, because of the nature of the remedy (reversal) ordered herein, any issue regarding the VCAA is moot.

## IV.  Conclusion

Upon consideration of the foregoing analysis, the ROA, and the parties' pleadings, the Court reverses the May 25, 2001, BVA decision and remands the matter to the Board with directions to assign an increased rating of not less than 60%, with an effective date established in accordance with applicable law and regulation.

REVERSED AND REMANDED.