http://www.va.gov/vetapp16/Files6/1644959.txt

Citation Nr: 1644959 
Decision Date: 11/30/16 Archive Date: 12/09/16

DOCKET NO. 11-03 863 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Columbia, South Carolina

THE ISSUES

1. Entitlement to service connection for posttraumatic stress disorder (PTSD).

2. Entitlement to service connection for a hernia.

3. Entitlement to an initial disability rating in excess of 10 percent for a left knee disability, with a separate 10 percent rating for limitation of extension of the left knee.

4. Entitlement to a temporary total evaluation for convalescence following hernia surgery.

 5. Entitlement to a total disability rating based upon individual unemployability due to service-connected disabilities (TDIU).

REPRESENTATION

Veteran represented by: Disabled American Veterans

WITNESS AT HEARING ON APPEAL

The Veteran

ATTORNEY FOR THE BOARD

K. Kovarovic, Associate Counsel 

INTRODUCTION

The Veteran served on active duty from July 1977 to July 1980.

These matters come before the Board of Veterans' Appeals (Board) from several rating decisions by the Department of Veterans Affairs (VA) Regional Office (RO) in Columbia, South Carolina. Specifically, a December 2010 rating decision awarded the Veteran an initial disability rating of 10 percent for left knee chondromalacia. A January 2012 rating decision denied the Veteran's claim for entitlement to service connection for PTSD. A November 2013 rating decision denied the Veteran's claims for entitlement to service connection for a hernia and for a temporary total evaluation for convalescence. An August 2015 rating decision denied the Veteran's claim for entitlement to a TDIU. A September 2015 rating decision granted a separate 10 percent rating for limitation of extension of the left knee. 

The Board notes that the Veteran initially filed a claim for entitlement to PTSD. However, a March 2015 Board decision expanded the Veteran's claim to include all acquired psychiatric disabilities, and remanded the matter for additional development. See Clemons v. Shinseki, 23 Vet. App. 1, 5 (2009) (holding that the scope of a disability claim includes any disability that may reasonably be encompassed by the veteran's description of the claim; reported symptoms; and additional information submitted or developed in support of the claim). A subsequent September 2015 rating decision awarded the Veteran a 50 percent disability rating for a mood disorder. As such, only the limited matter of the Veteran's entitlement to service connection for PTSD is currently before the Board. See Amberman v. Shinseki, 570 F.3d 1377, 1381 (Fed. Cir. 2009).

Further, the Veteran testified during a videoconference hearing before the undersigned Veterans Law Judge (VLJ) in January 2015 regarding his left knee claim, and a transcript of said hearing is of record. The Board notes that the Veteran has not requested a VA hearing for any of the additional claims currently before the Board. As such, the Board may properly proceed with review of these claims at this time. See 38 U.S.C.A. § 7107(b) (West 2014); 38 C.F.R. § 20.700(a) (2015). 

Finally, two issues have been raised by the record but have not been adjudicated by the Agency of Original Jurisdiction (AOJ): (1) Entitlement to service connection for a pain disorder, as raised by the Veteran in a March 1998 claim; and (2) entitlement to service connection for dental problems, as raised by the Veteran in a May 2007 claim. Therefore, the Board does not have jurisdiction over them, and they are referred to the AOJ for appropriate action. 38 C.F.R. § 19.9(b) (2015). 

The issues of entitlement to service connection for hernia, entitlement to a temporary total evaluation for convalescence following surgery for hernia, and entitlement to a TDIU are addressed in the REMAND portion of the decision below and are REMANDED to the AOJ.

FINDINGS OF FACT

1. The most probative evidence of record fails to demonstrate a causal nexus between the Veteran's claimed PTSD and the in-service stressor. 

2. Throughout the entire rating period on appeal, the Veteran's left knee disability manifested by chronic pain and slight instability. 

CONCLUSIONS OF LAW

1. The criteria for service connection for PTSD have not been met. 38 U.S.C.A. §§ 1110, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303 (2015).

2. The criteria for a separate evaluation of 10 percent for left knee instability have been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 4.7, 4.71a, Diagnostic Codes 5256-5263 (2015).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

VA's Duties to Notify and Assist

As required by the Veterans Claims Assistance Act of 2000 (VCAA), VA has a duty to notify and assist veterans in substantiating claims for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A (West 2014); 38 C.F.R. § 3.159(b) (2015). Per the VCAA, when VA receives a complete or substantially complete application for benefits, it is required to notify the veteran and his or her representative, if any, of any information and medical or lay evidence necessary to substantiate the claim. 38 U.S.C.A. § 5103(a) (West 2014); 38 C.F.R. § 3.159(b) (2015); Quartuccio v. Principi, 16 Vet. App. 183 (2002). The United States Court of Appeals for Veterans Claims (Court) has interpreted this to mean that VA must inform the veteran of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and (3) that the veteran is expected to provide. Pelegrini v. Principi, 18 Vet. App. 112, 120-21 (2004).

Here, VA has satisfied its duty to notify the Veteran. In letters dated February 2011 and April 2011, the Veteran was notified of the information and evidence necessary to substantiate his claim; the information and evidence that VA would seek to provide; and the information and evidence that he was expected to provide. These letters also notified the Veteran of the process by which disability ratings and effective dates are established. Dingess v. Nicholson, 19 Vet. App. 473 (2006).

Further, VA has satisfied its duty to assist the Veteran. The claims file includes the Veteran's service records and VA and private treatment records. The Veteran also underwent relevant VA examinations in August 2012, September 2012, May 2013, and May 2015. The accompanying reports reflect that the VA examiners reviewed the Veteran's claims file, recorded his current complaints, conducted appropriate examinations, rendered appropriate diagnoses and opinions consistent with the evidence of record, and provided rationales for the opinions expressed. As such, the Board finds that the VA examination reports and opinions are adequate. Barr v. Nicholson, 21 Vet. App. 303, 312 (2007). 

Accordingly, the Board finds that VA has satisfied its duties to notify and assist the Veteran under governing laws and regulations. 

Stegall Considerations

These claims were previously remanded by the Board in March 2015 to allow for additional development. At that time, the RO was instructed as follows: 
(1) Schedule the Veteran for a new VA examination to assess the current severity of his left knee disability; (2) schedule the Veteran for a new VA examination to assess the nature and etiology of any current psychiatric disability; and 
(3) readjudicate the claims and issue a Supplemental Statement of the Case (SSOC) if either claim remained denied.

A claimant has the right to substantial compliance with remand directives. See Stegall v. West, 11 Vet. App. 268, 271 (1998) (holding that a remand by the United States Court of Appeals for Veterans Claims Court (Court) or the Board confers on the veteran or other claimant, as a matter of law, the right to compliance with the remand orders). Here, the Veteran was provided with VA knee and psychiatric examinations in May 2015 and August 2015. In September 2015, the RO issued an SSOC denying the Veteran's left knee claim, and a rating decision awarding the Veteran a 50 percent disability rating for a mood disorder.

As such, the Board finds that the AOJ has substantially complied with the prior remand orders. See D'Aries v. Peake, 22 Vet. App. 97 (2008) (holding that only substantial, and not strict compliance with the terms of a remand request, is required). Accordingly, the Board will now review the merits of the Veteran's claims.

Service Connection for PTSD

The Board first turns to the Veteran's claim for entitlement to service connection for PTSD.

Service connection may be granted for a disability resulting from disease or injury incurred in, or aggravated by, active military service. 38 U.S.C.A. §§ 1110, 1131 (West 2014); 38 C.F.R. § 3.303(a) (2015). Service connection may also be granted for any disease initially diagnosed after service when the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d) (2015).

To establish service connection for PTSD, three elements must be present: (1) A current medical diagnosis of PTSD in accordance with 38 C.F.R. § 4.125(a) (2015) [i.e., a diagnosis under the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)]; (2) medical evidence of a causal nexus between current symptomatology and a claimed in-service stressor; and (3) credible supporting evidence that the claimed in-service stressor actually occurred. 38 C.F.R. § 3.304(f) (2015); Cohen v. Brown, 10 Vet. App. 128 (1997). Regarding the diagnosis of PTSD, an interim final rulemaking recently amended § 4.125(a), effective August 4, 2014, to state that diagnosis of a mental disorder must conform to DSM-5, not DSM-IV. 79 Fed. Reg. 45,093 (Aug. 4, 2014). However, the applicability date of the rulemaking indicates that the revision does not apply to a case that was certified to or pending before the Board prior to or on August 4, 2014. See id. at 45,093. Since the Veteran's case was certified to the Board in September 2013, a current diagnosis must be made in accordance with DSM-IV.

With regard to the second element, the evidence needed to establish the claimed stressor varies depending on whether it can be determined that the veteran engaged in combat with the enemy. 38 U.S.C.A. § 1154(b) (West 2014); 38 C.F.R. 3.304(d) (2015). Where it is determined that a veteran did not engage in enemy combat, or where the claimed stressor is unrelated to combat, the veteran's lay testimony alone is not sufficient to establish the occurrence of the alleged stressor. See Moreau v. Brown, 9 Vet. App. 389, 395-96 (1996); Dizoglio v. Brown, 9 Vet. App. 163, 166 (1996). In such cases, the record must include service records or other credible evidence that supports and does not contradict the veteran's testimony. Doran v. Brown, 6 Vet. App. 283, 289 (1994). Moreover, a medical opinion diagnosing PTSD does not suffice to verify the occurrence of the claimed in-service stressors. See Moreau, 9 Vet. App. at 395-96; Cohen, 10 Vet. App. at 142.

In applying these standards to the case at hand, the Board finds that service connection is not warranted for PTSD at this time. 

At the outset, the Board finds that there is conflicting evidence regarding whether there is a current diagnosis of PTSD. In this regard, the Board notes that the Veteran underwent VA psychiatric examinations in August 2012, September 2012, May 2013, and May 2015. Upon examination of the Veteran and review of the evidence of record, all four VA examiners declined to diagnose the Veteran with PTSD in accordance with the diagnostic criteria set forth in DSM-IV, as required by 38 C.F.R. § 4.125(a).

On the other hand, VA treatment records dated September 2013, October 2014, February 2015, and July 2015 assert a diagnosis of PTSD and explicitly delineate that the Veteran was diagnosed in accordance with DSM-IV. Further, accompanying treatment notes commonly included the Veteran's diagnostic impression and an analysis of his current symptoms against the requisite diagnostic criteria. The Board finds that these records arguably stand as competent evidence of a current diagnosis made in compliance with the provisions of 38 C.F.R. § 4.125(a). 

Further, the record contains competent evidence regarding one of the Veteran's claimed in-service, noncombat-related stressors. In April 2011, the Veteran submitted a lay statement identifying two such stressors. The first, involving an incident where several intoxicated servicemembers bit the heads off multiple pigeons, was deemed unverified by the Board in its March 2015 remand.

However, the Veteran's second identified stressor is corroborated by the evidence of record. In April 2011, the Veteran reported that in late summer of 1978 or 1979, several unexploded ordinances were retrieved during a field exercise at Fort Bragg. These ordinances were returned to the base and immediately placed in conexes. However, later that evening, several sergeants retrieved the "duds" and placed them on the ground. Several soldiers gathered around the ordinances, which subsequently exploded. The resulting explosion sent shrapnel and blast waves into the crowd and severely wounded several soldiers, including one who lost an arm and another who lost a leg. 

The Board finds that the Veteran's testimony stands as competent and credible evidence of the in-service stressor. A veteran is competent to report that which he perceives through the use of his senses, including events capable of lay observation. See Washington v. Nicholson, 19 Vet. App. 362, 368 (2005); Charles v. Principi, 16 Vet. App. 370 (2002) (finding the veteran competent to testify to symptomatology capable of lay observation); Layno v. Brown, 6 Vet. App. 465, 469 (1994) (noting competent lay evidence requires facts perceived through the use of the five senses). 

Further, the Veteran's reports are largely supported by the evidence of record. See Moreau, 9 Vet. App. at 395-96. A November 2011 Defense Personnel Records Information Retrieval System (DPRIS) response indicates that the US Army Combat Readiness Center documented a July 1978 incident wherein a soldier from the 426th Signal Battalion removed an M72, 66mm round from a trash can located behind the 35th Signal Group Consolidated Maintenance Facility during a police call. The round was disposed of in a trash can. Minutes after the removal, the round exploded, injuring eight soldiers who were working in the area. A corresponding November 2011 U.S. Joint Services Records Research Center (JSRRC) memorandum similarly notes "an event involving a soldier removing a 66 mm round from a trash can where the round later detonated[,] injuring eight soldiers." 

Although the JSRRC memorandum concludes that the "incident described in no way fits the description the Veteran provided to the VA," the Board disagrees with this assertion. Comparison of the DPRIS and JSRRC reports to the Veteran's testimony reveals a fundamentally similar fact pattern, wherein an unexploded ordinance was discovered during a July 1978 field exercise and subsequently exploded, injuring several soldiers. Additional evidence further corroborates the Veteran's recollection, including a notation on the Veteran's Certificate of Release or Discharge from Active Duty (DD-214) indicating that the Veteran was assigned to the 426th Signal Battalion and stationed at Fort Bragg. Such corroborating evidence, and the lack of any evidence tending to contradict the Veteran's report, compels the Board to find that competent and credible evidence of this claimed in-service stressor exists. 

Significantly, however, the May 2015 VA examiner asserted that no causal relationship exists between the July 1978 incident and the Veteran's ongoing psychiatric symptoms. Here, the examiner first declined to diagnose the Veteran with PTSD, noting that the in-service stressor was not adequate to support a diagnosis of PTSD. However, the examiner further addressed the lack of a causal relationship between the Veteran's existing psychiatric symptoms and the in-service stressor. In doing so, the examiner noted that the Veteran suffered from a cerebral aneurysm in November 1981. Since that time, the Veteran has made a hobby of watching military-themed movies and television shows. In the examiner's opinion, it was likely that much of the Veteran's reported "traumatic experiences" were actually internalizations of these movies and television shows, which the Veteran then attributed to the sense of loss and personal damage he experienced from his time in service. As such, the examiner indicated that the Veteran's aneurysm and its proximity to his discharge from service, coupled with his affinity for watching military media, has caused the Veteran to confuse the events of his own service with that which he has seen in movies and television shows. Accordingly, the Veteran's symptomatology stands as a complication of his aneurysm, for which he is not service-connected, and not as a symptom of his PTSD. 

In considering the probative value of the above opinion, the Board acknowledges that the VA examiner failed to address the Veteran's history of PTSD diagnoses per the DSM-IV criteria. See Reonal v. Brown, 5 Vet. App. 458, 461 (1993) (holding that the Board may reject a medical opinion based on an inaccurate or incomplete factual basis). However, the Board finds that this deficiency does not override the probative value of the examiner's nexus opinion. Instead, the VA examiner undertook an extensive analysis of the Veteran's entire medical and social history, and offered a definitive nexus opinion based upon a detailed rationale. Prejean v. West, 13 Vet. App. 444, 448-49 (2000); see also Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 302-04 (holding that the probative value of a medical opinion comes from the "factually accurate, fully articulated, sound reasoning for the conclusion"). In doing so, the examiner found that it was less likely than not that any of the Veteran's psychiatric symptoms-whether due to his service-connected mood disorder or his nonservice-connected PTSD-were causally related to the July 1978 explosion. In other words, the examiner properly accounted for the full scope of the Veteran's psychiatric symptoms, and found no link between said symptoms and the July 1978 event. As such, the examiner has competently established that no link exists between the Veteran's symptomatology and the in-service stressor. Accordingly, the Board assigns significant probative value to the May 2015 opinion.

Further, the Board notes the distinct lack of evidence tending to show a causal nexus in this case. Although the claims file contains additional VA and private medical records, none tend to demonstrate the necessary causal link for a finding of service connection in this case. Instead, the only positive nexus opinion of record is offered by the Veteran himself. However, without appropriate medical training and expertise, which he has not demonstrated, the Veteran is not competent to provide an opinion regarding etiology. See Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007); see also Jones v. West, 12 Vet. App. 383, 385 (1999) (where the determinative issue is one of medical causation or a diagnosis, only those with specialized medical knowledge, training, or experience are competent to provide evidence on the issue). The Board affords greater credibility to the May 2015 examiner's opinion, and finds that no nexus exists between the July 1978 event and the Veteran's current psychiatric symptoms. 

The Board seeks to make an important distinction at this time. The finding here is not that the July 1978 event did not occur; indeed, the Board concedes that the evidence of record has sufficiently corroborated the Veteran's testimony regarding this event. Instead, the Board finds that the July 1978 event is not productive of the Veteran's current psychiatric symptoms, as the evidence tends to establish that the Veteran's ongoing symptomatology is due to alternative causes, including his post-service aneurysm in 1981.

Thus in the absence of a nexus between the Veteran's claimed PTSD and the verified in-service stressor, the claim for entitlement to service connection for PTSD must be denied.

Initial Rating for Left Knee Chondromalacia

The Board now turns to the Veteran's claim for an initial evaluation in excess of 10 percent for left knee chondromalacia.

Disability ratings are assigned under a schedule for rating disabilities and based on a comparison of the veteran's symptoms to the criteria in the rating schedule. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. Part 4 (2015). Disability evaluations are determined by assessing the extent to which a veteran's service-connected disability adversely affects his ability to function under the ordinary conditions of daily life, including employment, by comparing his symptomatology with the criteria set forth in the ratings schedule. Individual disabilities are assigned separate Diagnostic Codes, and ratings are based on the average impairment of earning capacity. See 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. § 4.1 (2015). If there is a question as to which evaluation should be applied to the veteran's disability, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2015).

The primary focus in a claim for increased rating is the present level of disability. Although the overall history of the veteran's disability shall be considered, the regulations do not give past medical reports precedence over current findings. Francisco v. Brown, 7 Vet. App. 55, 58 (1994). Additionally, a staged rating is warranted if the evidence demonstrates distinct periods of time in which a service-connected disability exhibited diverse symptoms meeting the criteria for different ratings throughout the course of the appeal. Fenderson v. West, 12 Vet. App, 119, 125-126 (1999); Hart v. Mansfield, 21 Vet. App. 505 (2007). 

Disability of the musculoskeletal system is primarily the inability, due to damage or inflammation in parts of the system, to perform normal working movements of the body with normal excursion, strength, speed, coordination, and endurance. The functional loss may be due to absence of part or all of the necessary bones, joints and muscles, or associated structures, or to deformity, adhesions, defective innervation, or other pathology, or may be due to pain, supported by adequate pathology and evidenced by visible behavior of the claimant undertaking the motion. Weakness is as important as limitation of motion, and a part which becomes painful on use must be regarded as disabled. See DeLuca v. Brown, 8 Vet. App. 202 (1995); 38 C.F.R. § 4.40 (2015); see also 38 C.F.R. §§ 4.45, 4.59 (2015). Although pain may be a cause or manifestation of functional loss, limitation of motion due to pain is not necessarily rated at the same level as functional loss where motion is impeded. See Mitchell v. Shinseki, 25 Vet. App. 32 (2011).

With particular respect to the joints, the disability factors reside in reductions of normal excursion of movements in different planes. Inquiry will be directed to more or less than normal movement, weakened movement, excess fatigability, incoordination, pain on movement, swelling, deformity or atrophy of disuse. 38 C.F.R. § 4.45 (2015).

The provisions of 38 C.F.R. §§ 4.10, 4.40, and 4.45 shall be considered in determining the degree of limitation of motion. See DeLuca v. Brown, 8 Vet. App. 202 (1995). The intent of the schedule is to recognize painful, unstable, or malaligned joints, due to healed injury, as entitled to at least the minimum compensable rating for the joint. 38 C.F.R. § 4.59 (2015). When the evaluation of a disability is based on limitation of motion, the Board must also consider, in conjunction with the otherwise applicable diagnostic code, any additional functional loss the veteran may have by virtue of other factors as described in 38 C.F.R. §§ 4.40 and 4.45. DeLuca, 8 Vet. App. at 206. 

Here, the Veteran's left knee disability has been rated under Diagnostic Code 5260.

Under Diagnostic Code 5256, ratings of 30 percent through 60 percent are warranted with evidence showing varying degrees of ankylosis. 38 C.F.R. § 4.71a, Diagnostic Code 5256 (2015).

Under Diagnostic Code 5257, a 20 percent rating is warranted with evidence showing moderate recurrent subluxation or lateral instability, and a 30 percent rating is warranted with evidence of severe recurrent subluxation or lateral instability. 38 C.F.R. § 4.71a, Diagnostic Code 5257 (2015).

Under Diagnostic Code 5258, a 20 percent rating is warranted for cartilage, semilunar dislocated, with frequent episodes of locking, pain, and effusion into the joint. 38 C.F.R. § 4.71a, Diagnostic Code 5258 (2015).

Under Diagnostic Code 5259, a 10 percent rating is warranted for removal of semilunar cartilage that is symptomatic. 38 C.F.R. § 4.71a, Diagnostic Code 5259 (2015).

Under Diagnostic Code 5260, ratings of zero percent (noncompensable) through 30 percent are warranted with evidence showing varying degrees of limited flexion. 38 C.F.R. § 4.71a, Diagnostic Code 5260 (2015).

Under Diagnostic Code 5261, ratings of zero percent (noncompensable) through 50 percent are warranted with evidence showing varying degrees of limited extension. 38 C.F.R. § 4.71a, Diagnostic Code 5261 (2015).

Under Diagnostic Code 5262, pertaining to impairment of the tibia and fibula, malunion with slight knee or ankle disability warrants a 10 percent rating; malunion with moderate knee or ankle disability warrants a 20 percent rating; malunion with marked knee or ankle disability warrants a 30 percent rating; and nonunion of the tibia and fibula, with loose motion, requiring brace warrants a maximum 40 percent rating. 38 C.F.R. § 4.71a, Diagnostic Code 5262 (2015).

Under Diagnostic Code 5263, Genu recurvatum (acquired, traumatic, with weakness and insecurity in weight-bearing objectively demonstrated) warrants a 10 percent rating. 38 C.F.R. § 4.71a, Diagnostic Code 5263 (2015).

The Board will now analyze the evidence of record in light of these rating criteria. In doing so, the Board first notes that it has reviewed all of the evidence in the Veteran's claims file, placing an emphasis on that relevant to this appeal. Although the Board has an obligation to provide reasons and bases supporting its decision, there is no obligation to discuss, in detail, the extensive evidence of record. Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000) (holding that the Board must review the entire record, but does not have to discuss each piece of evidence). Therefore, the Board will summarize the relevant evidence where appropriate, and the Board's analysis will focus specifically on what the evidence shows, or fails to show, as it relates to the Veteran's claims.

Social Security Administration (SSA) records indicate that the Veteran underwent private orthopedic examination in June 2008. At that time, the Veteran's left knee flexion and extension were determined to be within normal limits. However, the Veteran required the use of a cane to walk across the room. 

VA treatment records dated June 2008 to February 2012 include the Veteran's ongoing complaints of chronic knee pain and use of assistive devices including various braces. 

During a May 2009 VA neurological examination, the Veteran's reflexes were noted as 2+ bilaterally. 

During a May 2010 VA feet and joints examination, the Veteran's wife reported that he frequently complained of left knee pain and experienced locking, instability, and swelling. As a result, the Veteran occasionally fell due to instability and experienced difficulty bending and lifting. Further, the Veteran's reported knee pain caused sleep disruption. To treat his symptoms, the Veteran underwent physical therapy with minimal relief and utilized a knee brace to assist with ambulation. On examination, there was slight popping of the knee with full range of motion, reported as follows: 0 degrees to full extension; 20 degrees of flexion pain-free, further to 100 degrees with pain; and no pain or fatigue following repetitive motion. There was no ligamentous laxity in any direction of the left knee, but there was diffuse tenderness to palpation as well as moderate crepitus. An accompanying x-ray was normal. As such, the assessment was chondromalacia, and treatment was conservative. 

That same month, the Veteran was fitted for a neoprene knee sleeve and a hinged knee brace. 

The Veteran was admitted to a VA hospital in June 2011 for psychiatric treatment. Accompanying treatment notes include references to the Veteran's left knee disability, and indicate the Veteran's use of a soft knee brace and a cane to assist with ambulation. During this time, the Veteran reported chronic knee pain that he characterized as a dull ache. However, when combined with the Veteran's back, wrist, and other pain, the Veteran reportedly pain at an intensity of 10 out of 10 that sometimes caused unconsciousness. An accompanying treatment note refers to a recent knee surgery.

VA treatment records dated August 2011 reference the Veteran's recent request for a left knee brace. 

The Veteran underwent VA knee examination in April 2012, and was diagnosed with left knee degenerative joint disease at that time, based in part upon accompanying x-rays. During the examination, the Veteran reported the daily use of a knee brace to assist with ambulation, but denied prior surgeries or recent treatment for his condition. The Veteran further reported flare-ups limiting the functioning of his knee, to include pain and swelling, such that prolonged weight-bearing activities were limited. Instead, the Veteran stated that he "pretty much [had] to sit around all day." Range of motion testing yielded the following results: flexion to 80 degrees, with evidence of pain at 70 degrees; extension to 10 degrees, with no limitation. The Veteran was able to perform repetitive-use testing. As such, the Veteran's knee flexion and extension were rated as a four out of five, indicating active movement with some resistance. Additional functional loss was noted, including less movement than normal; pain on movement; disturbance of locomotion; and interference with sitting, standing, and weight-bearing. Tenderness or pain to palpation for joint line or soft tissues of the knee was noted. Anterior, posterior, and medial-lateral instability were normal, and there was no evidence of recurrent patellar subluxation or dislocation. 

VA treatment records dated April 2012 to August 2015 include the Veteran's reports of ongoing knee pain and the use of medication, injections, assistive devices, and physical therapy to assist with managing his symptoms. In July 2012, the Veteran reported weakness in his left knee, rated as a three to four out of five. In August 2012, the Veteran noted that his left knee occasionally gave out. In September 2012, the Veteran rated his knee pain as a six out of ten. Active range of motion testing yielded the following results: flexion to 52 degrees; extension to zero degrees; and pain with all movements. Passive range of motion testing yielded the following results: flexion within normal limits; extension to zero degrees; and pain with all movements. As such, decreased active range of motion and knee strength was noted. In October 2012, the Veteran rated his knee pain as a seven out of ten and noted ongoing instability. No edema, crepitus, or swelling was noted at that time. Medial and lateral joint line tenderness on palpation was noted, as was pain on motion. 

Further, in July 2013, the Veteran reported swelling, redness, heat, and daily bilateral knee pain. In August 2014, the Veteran reported that the use of therapy, braces, and a rollator had assisted with reducing his knee pain. As such, the Veteran reported minimal swelling, which was typically managed with the use of medication. Upon examination, no tenderness on palpation, effusion, erythema, motion crepitus, patella crepitus, pain elicited by motion, or motor strength weakness was noted. The Veteran's motion ranged from zero to 130, and accompanying x-rays revealed no significant changes since 2012. Although the Veteran requested a new knee brace in April 2015, it is unclear whether he intended its use for his right or left knee. Additionally, subsequent treatment notes indicate that the Veteran's recent x-rays did not support the need for a knee brace, and instead showed a need for exercise. 

The Veteran testified regarding his left knee disability during a January 2015 videoconference hearing. At that time, the Veteran reported ongoing pain, weakness, and instability of the left knee. In particular, the Veteran noted that his knee instability contributed to several falls, thereby requiring the use of a metal knee brace to prevent his knee from buckling. The additional use of a walker and medications to manage pain and swelling were also noted. However, the Veteran denied consistent participation in physical therapy, as he was instructed by a VA physician that "there's not much they can do for [the] knee right now." The Veteran further testified regarding the impact of his disability on his daily living, such that he was unable to walk around his home, travel up and down stairs, and bend down. As a result, the Veteran experienced difficulty putting groceries or laundry away or retrieving his mail, and he no longer drove on his own. As such, he required assistance in completing such tasks as purchasing his groceries. 

The Veteran underwent VA knee and lower leg examination in May 2015, and was diagnosed with knee joint osteoarthritis at that time. Further, no change was reported with the Veteran's left knee chondromalacia diagnosis. During examination, the Veteran reported no flare-ups or functional loss/impairment. However, functional loss was noted by the examiner upon range of motion testing, which yielded the following results: flexion to 90 degrees; extension to 90 degrees. The Veteran was able to perform repetitive-use testing without additional loss of range of motion. Pain was noted upon both flexion and extension, and there was additional evidence of pain with weight-bearing. Such results coincided with the Veteran's reports of pain with standing and the inability to squat down. Further, there was objective evidence of localized tenderness or pain to palpation of the joint or associated soft tissue, such that the Veteran was very tender to palpation in the entire left knee. No evidence of crepitus, ankylosis, or joint instability was reported, and a history of recurrent subluxation or lateral instability was explicitly denied. Further, no evidence of locking was reported. However, instability of station, disturbance of locomotion, and interference with standing were noted. The Veteran's related symptoms did not significantly limit the ability of repeated use over a period of time. The Veteran's muscle strength was normal, and no history of surgery was reported. However, the constant use of a brace and walker was noted. 

The Veteran underwent subsequent VA knee and lower leg examination in August 2015. Here, the Veteran's diagnoses of knee joint osteoarthritis and left knee chondromalacia were confirmed, in part by accompanying x-rays. The Veteran presented to examination with a soft brace over the left knee, and ambulating with the assistance of a rollator. Although the Veteran reported constant knee pain and pain with flexion, he reported no instances of flare-ups. However, the Veteran indicated that his knee experienced pain with standing, and prevented him from squatting and kneeling. However, the examiner noted that the Veteran's primary problem was not caused by his left knee disability, but instead by his right-sided paralysis as caused by his earlier aneurysm. No symptoms of laxity were noted, and the Veteran was able to actively flex his left knee to 110 degrees. Pain was noted upon flexion. Further, passive range of motion was noted as 130 degrees, with extension to zero. As such, the examiner asserted that range of motion itself did not contribute to functional loss. However, repetitive range of motion testing could not be performed, as the Veteran declined to participate per the examiner's request. Muscle strength upon forward flexion and extension was normal. Crepitus was noted on examination, but no evidence of locking, instability, or subluxation was noted. Instead, anterior, posterior, and medial instability was noted as normal. Additionally, excess fatigability, weakened movement, incoordination, effusion, and ankylosis were explicitly denied. However, there was evidence of pain with weight-bearing and tenderness to palpation along the entire joint line. No history of surgery was reported, but the constant use of a brace and walker was noted.

In considering the frequency, severity, and duration of the Veteran's symptoms, the Board finds that a separate 10 percent rating is warranted for left knee instability at this time. Throughout the entire rating period on appeal, the Veteran's primary symptoms included chronic left knee pain and instability. During this time, the Veteran's left knee instability caused difficulty with bending, kneeling, lifting, and using stairs, and further contributed to numerous falls. As a result, the Veteran was prescribed a specialty metal brace to prevent his knee from buckling. Although the August 2015 examiner asserted that the Veteran's main problem was not his left knee disability but caused by his right-sided paralysis as due to his aneurysm, the Board lends equal credibility to the Veteran's own observations regarding his left knee and its contribution to his ongoing instability. See Washington v. Nicholson, 19 Vet. App. 362, 368 (2005); Charles v. Principi, 16 Vet. App. 370 (2002) (finding the veteran competent to testify to symptomatology capable of lay observation); Layno v. Brown, 6 Vet. App. 465, 469 (1994) (noting competent lay evidence requires facts perceived through the use of the five senses). As such, the Board finds that the Veteran's left knee disability is productive of slight instability, such that a separate 10 percent disability rating is warranted per Diagnostic Code 5257. The Board finds that the instability is not shown to be moderate or severe in light of the repeated objective findings on examination which weighed against a finding of instability. 

Thus, the ratings for the left knee now include a 10 percent rating under Diagnostic Coode 5260 (limitation of flexion), a separate 10 percent rating for limitation of extension under Diagnostic Code 5261, and a separate 10 percent for slight limitation for motion under Diagnostic Code 5257. 

In making this determination, the Board acknowledges that a higher schedular evaluation than 10 percent is available for knee disabilities. However, the evidence of record does not demonstrate that the Veteran experienced the requisite symptoms to justify such a rating at this time, to include reports of ankylosis, moderate recurrent subluxation or lateral instability, more severe limitation of range of motion of either flexion or extension, impairment of the tibia or fibula, or genu recurvatum. See 38 C.F.R. §§ 4.7, 4.71a, Diagnostic Codes 5256-5257, 5260-5263 (2015).

The Board further acknowledges the Court's recent holding that VA examinations must include joint testing for pain on both active and passive motion, in weightbearing and non-weightbearing and, if possible, with range of motion measurements of the opposite undamaged joint. Correia v. McDonald, 28 Vet. App. 158 (2016). In reviewing the evidence of record, the Board finds that the May 2015 and August 2015 examinations, taken in combination, satisfy these requirements. Here, the August 2015 examiner addressed passive range of motion, and the May 2015 examiner included range of motion results for the opposite joint, though clearly damaged. Although the examiners do not address range of motion upon weight-bearing, the August 2015 examiner clearly indicates that the Veteran "showed poor effort and would not repeat range of motion for this examiner." As such, the examiner's inability to fully address the requirements of Correia are not due to any failure of VA, but instead to the unwillingness of the Veteran to cooperate with complete range of motion testing. As such, the Board finds that providing an additional VA examination would not assist in the adjudication of this claim, and that the existing examination results are adequate for rating purposes. See Barr v. Nicholson, 21 Vet. App. 303, 312 (2007).

Additionally, prior x-rays of the Veteran's left knee are indicative of osteoarthritis and degenerative joint disease. Such diagnoses engage the provisions of Diagnostic Code 5003, which provides that evaluation of traumatic arthritis shall be on the basis of limitation of motion under the appropriate Diagnostic Codes for the specific joint or joints involved. If this results in a noncompensable evaluation, a 10 percent evaluation is assigned for each major joint or group of minor joints affected. In the absence of any limitation of motion, involvement of two or more major joints or two or more minor joint groups warrants a 10 percent evaluation, and the same with occasional incapacitating exacerbations warrants a 20 percent evaluation. See 38 C.F.R. § 4.71a, Diagnostic Code 5003 (2015). As the Veteran has already been assigned a compensable disability rating for his left knee disability, a higher evaluation is not warranted per the provisions of Diagnostic Code 5003. 

Accordingly, the Board finds that the Veteran is entitled to a separate 10 percent evaluation for left knee instability at this time. 

Extraschedular Consideration

The Board has also considered whether the Veteran is entitled to referral for extraschedular consideration for his left knee disability. Thun v. Peake, 22 Vet App 111 (2008). Such referral is appropriate when the evidence presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are considered inadequate. Id. at 115. In such a case, the Board must consider whether there is evidence of other such factors as marked interference with employment or frequent periods of hospitalization. Id. at 115-16. If such evidence is present, the appeal must be referred for consideration of the assignment of an extraschedular rating to the Chief Benefits Director or the Director, Compensation and Pension Service. 38 C.F.R. § 3.321(b)(1) (2015). Otherwise, the schedular evaluation is considered adequate and referral is not required. Thun, 22 Vet. App. at 118-19.

Here, the Board finds that the Veteran's disability picture is not so unusual or exceptional in nature as to render the schedular evaluations inadequate. The full scope of the Veteran's symptoms, including pain and instability requiring the use of medication, a knee brace, and a walker, have been properly accounted for, and the criteria for the disability rating assigned herein more than reasonably describes the Veteran's disability level and symptomatology during the rating period on appeal. Further, the Board observes that a higher schedular rating is available for the Veteran's disability. However, the facts do not indicate that the Veteran's disability picture warrants a higher rating. As the ratings criteria reasonably describe the Veteran's disability and symptomatology, it is not necessary to consider whether his disability causes marked interference with employment or periodic hospitalizations. As such, the schedular evaluation is adequate, and no referral is required. See 38 C.F.R. § 4.71a, Diagnostic Code 9411 (2015).

ORDER

Entitlement to service connection for PTSD is denied.

Entitlement to a separate evaluation of 10 percent for instability of the left knee, but not higher, is granted. 

REMAND

There are three additional claims before the Board at this time: (1) Entitlement to service connection for hernia; (2) entitlement to a temporary total evaluation for convalescence following surgery for hernia; and (3) entitlement to a TDIU. Although the Board sincerely regrets the additional delay this may cause, additional development is necessary prior to adjudication of these claims. 

With regard to the first claim, the Board notes that the Veteran has not undergone VA hernia examination to date. Generally, a VA medical examination is required for a service connection claim when there is: (1) Competent evidence of a current disability or persistent or recurrent symptoms of a disability; (2) evidence establishing that an event, injury, or disease occurred in-service or establishing certain diseases manifesting during an applicable presumptive period for which the claimant qualifies; and (3) an indication that the disability or persistent or recurrent symptoms of a disability may be associated with the veteran's service or with another service-connected disability; but (4) insufficient competent medical evidence on file for the VA to make a decision on the claim. 38 U.S.C.A. § 5103A(d) (West 2014); 38 C.F.R. § 3.159(c)(4) (2015); see also McLendon v. Nicholson, 20 Vet. App. 79, 83 (2006).

With respect to the third factor, the Court has held that this element establishes a low threshold and requires only that the evidence indicates that there may be a nexus between the current disability or symptoms and a veteran's service. Such relevant evidence includes, but is not limited to, medical evidence suggesting a nexus but which is too equivocal or lacking in specificity to support a decision on the merits, or credible evidence of continuity of symptomatology such as pain or other symptoms capable of lay observation. McLendon, 20 Vet. App. at 79. 

A veteran is not entitled to a VA examination based solely upon his own conclusory statements indicating a relationship between an in-service illness or injury and a present disability. See Waters v. Shinseki, 601 F.3d 1274, 1278 (Fed. Cir. 2010). Instead, the record must contain some other factual basis supporting the veteran's statements. Id. at 1278; see also Colantonio v. Shinseki, 606 F.3d 1378 (Fed. Cir. 2010). However, the Veteran is competent to testify as to continuity of symptoms since an event in service. 

Here, the Veteran's STRs indicate the existence of a right inferior oblique hernia in May 1980, and the Veteran has testified as to the continuity of his symptoms since that time. Additionally, VA treatment records indicate that the Veteran was diagnosed with a hernia in July 2008, and underwent a corrective herniorrhaphy in December 2012. However, the claims file does not contain a competent medical opinion addressing the possible causal nexus between the Veteran's in-service hernia and the later instance noted in his VA treatment records. As such, the Board finds that a VA examination is warranted at this time such that an adequate nexus opinion may be obtained. 

Further, the Board is unable to properly review the Veteran's temporary total evaluation claim at this time. Here, the Veteran has asserted a period of total convalescence following his December 2012 herniorrhaphy. Veterans who are unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities shall be rated as totally disabled. 38 C.F.R. §§ 4.15, 4.16(b) (2015). When the disability is temporary in nature, such as during a period of convalescence following surgery, temporary total disability ratings may be awarded. As such, the success of the Veteran's temporary total evaluation claim is dependent upon whether service connection is awarded for his claimed hernia, such that the two issues are inextricably intertwined. See Harris v. Derwinski, 1 Vet. App. 180, 183 (1991) (finding two issues are "inextricably intertwined" when they are so closely tied together that a final decision on one issue cannot be rendered until a decision on the other issue has been rendered); Holland v. Brown, 6 Vet. App. 443, 445-46 (1994). Accordingly, remand of the Veteran's hernia claim necessitates remand of the temporary total evaluation claim, as well. 

The Board similarly finds that a remand of the Veteran's TDIU claim is warranted at this time. Adjudication of the Veteran's hernia claim may impact the Board's analysis regarding the Veteran's employability, such that the issues are inextricably intertwined. Id. Further, the Board notes that the Veteran has undergone approximately 19 VA examinations to date. Review of said examinations reveals that each VA examiner limited his or her analysis to a specific disability. However, no VA examiner has offered an opinion regarding the combined impact of all the Veteran's service-connected disabilities on his capacity to secure or follow a substantially gainful occupation. See Barr v. Nicholson, 21 Vet. App. 303, 312 (2007) (stating that when VA undertakes to provide a VA examination or obtain a VA opinion, it must ensure that the examination or opinion is adequate).

VA is not obligated to order a VA examination that considers the combined effects of a veteran's service-connected disabilities in every TDIU claim. See Geib v. Shinseki, 733 F.3d. 1350 (Fed. Cir. 2013). However, in this case, the record is insufficient to evaluate the combined effects of the Veteran's service-connected disabilities without such an opinion. Accordingly, the Board finds that a remand is needed to obtain an opinion that considers all of the Veteran's service-connected disabilities. 38 U.S.C.A. § 5103A(d)(2) (West 2014); 38 C.F.R. § 3.159(c)(4)(i) (2015).

Accordingly, the case is REMANDED for the following action:

1. Provide the Veteran with a new VA examination. The claims file and a copy of this remand must be made available for review, and the examination report must reflect that review of the claims file occurred.

The examiner should specifically address the following:

a. Whether it is at least as likely as not (50 percent probability or more) that the Veteran's hernia disability began in service, was caused by service, or is otherwise related to service, to include as due to aggravation from the Veteran's reported in-service duties? The examiner should also comment on whether any current hernia is related to the right inferior oblique hernia noted in service. 

b. Address the functional effects that the Veteran's service-connected disabilities, alone or in combination, have on his ability to secure or follow a substantially gainful occupation. When addressing the functional effects, the examiner must not consider the Veteran's age or any non-service connected disabilities.

In formulating the opinion, the examiner is advised that the term "at least as likely as not" does not mean "within the realm of possibility." Rather, it means that the weight of the medical evidence both for and against the claim is so evenly divided that it is as medically sound to find in favor of the claim as it is to find against it.

A complete rationale should be provided for any opinion or conclusion expressed.

If the Veteran fails to report for the examination, the examiner should nevertheless undertake a review of the claims file and respond to the above questions.

2. If the schedular criteria for TDIU under 38 C.F.R. § 4.16(a) are not met, then refer to claim to the Director of Compensation for consideration of extraschedular entitlement to TDIU pursuant to 38 C.F.R. § 4.16(b).

3. Readjudicate the claims on appeal. If any benefit remains denied, issue an SSOC to the Veteran and provide an appropriate period for response. Thereafter, return the appeal to the Board as warranted. 

The Veteran has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).

______________________________________________
MICHAEL MARTIN
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs